This matter will be U.S. v. Heron. Good morning. May it please the Court, Derek Cohen on behalf of the United States of America, the appellate in this matter. Your Honor, I'd like to reserve three minutes of rebuttal if that's okay with the panel. Okay. So Your Honor, may I ask you this? On page 42 of the government's brief, they make the following assertion or argument, and I'd like for you to respond to this if you would. They say, indeed, the district court ignored virtually all of the very strong circumstantial evidence of Heron's guilt, including the critical fact that at a time of month when he ordinarily knew the quarterly financial results, Heron spent nearly half his gross annual income to buy stock, $130,000 to $140,000 income, to buy stock and then sold most of it right after the financials were announced two weeks later, and the record reflected a pretty impressive gain. How would you respond to that in terms of whether or not the evidence of that trading was properly ignored in granting the new trial and dismissing the counts and basically taking away the jury's verdict? Well, Your Honor, I think Your Honor has hit on exactly what the problem was which permeates the entire district court opinion. This count in particular, Your Honor, is referring to 2003. This count was a count unlike the other insider trading counts that relied solely on circumstantial evidence. But when you say relied solely on circumstantial evidence, my mind boggles at how many people have probably been executed based solely upon circumstantial evidence. Well, I think you're... We've been in here for, we have since about 10 o'clock this morning. If I were to walk outside at lunch hour and I saw 10-foot snow drifts on the road and snow plows going up and down, based upon the way it looked outside when I came in the courthouse, I could conclude with some fair degree of certainty that it snowed while we were in here. It snowed pretty substantially. Now, that's circumstantial evidence. And you're arguing that, oh, you're right. I was just reminded, okay, we're so used to seeing the government on that side. I was really enjoying that, Your Honor. Never mind. I think Your Honor is making very cogent points. Never mind. Mr. Aronik, if you take a few minutes, you know where I'm going to be coming as you're from. Okay, all right. Okay, never mind. Do you want to rest on your knees or do you want to proceed? Every judge has done that. Yeah, I'm very used to seeing the government on this side. Let me ask you a question. Yes, Your Honor. You say at page 62 of your brief for the government that the district court's order for a new trial based on plain error should be reviewed for plain error. And I think maybe I'm missing something. Are you saying that we should examine, well, let me ask it this way. I would have thought that the government's position would be since the district court was interpreting Rule 52 and Rule 33, that there's plenary review over that interpretation of the rule. So when you said the plain error standard applies, I was puzzled. The only thing I could kind of think is maybe they're saying that if you look at the underlying stuff, you'd have to say whether there was plain error in what the prosecutor was doing in closing. But that isn't the way you framed it at page 62, I didn't think. So my question to you is, what standard are we supposed to bring to the question of how the judge decided to grant the conditional new trial? Right. And I apologize for not making that more clear in the brief. Your Honor is correct. Basically what happens here, there's two components to this. The first part is the order, which was basically the jurisdictional question, which the government submits should be decided as a legal matter pursuant to the plenary review. In other words, did Rule 33, did that deadline prohibit the judge from doing what he did, ordering the new trial? And we think the law clearly states that he did not have that jurisdiction. However, because the appellees is still maintaining that there was plain error for this court, certainly this court. In other words, you're saying if we got underneath the district court's legal ruling, we'd have to say there was plain error in what the government did in order to warrant the conditional grant of new trial. That's exactly right. And I think based on the appellee's position, I think this court has to, because it's taken the position that it argues in the alternative. It tries to defend the district court's ability to have done it in the first place, but then it goes to the circuit court to rule on the merits of whether there was plain error. In other words, you're saying that plain error is a doctrinal procedure that appellate courts use with respect to reviewing decisions before them, rather than what a trial court does with respect to a jury verdict? Yes. I think what happened here, we wound up in a strange procedural context because the district court tried to sort of shoehorn a plain error finding where there was no method to provide the relief. The law is clear that having not filed the motion for a new trial, the district court didn't have the ability to order a new trial. Then the district court somehow adopted Rule 52, which basically just sets out a standard, not a procedure by which to order a new trial. Ultimately, that's the standard that this court has to apply. But we still have the judgments of acquittal with respect to three of the counts, right? That's correct. The trial court went through each one very carefully, said there's no direct evidence. He did use the term direct evidence. That was the phrase he used. Yeah. Well, I was surprised, too, by the plain error. Did he ask for an inference that he had accurate data on the financials when he traded? Well, I'm happy to address each one of those. If I could start off with count 2, which Judge McKee began to ask questions upon, which was trading in October of 2003. And again, in the Rule 29 context, the question was whether the jury had acted irrationally. Was our failure of evidence so clear that the district court was compelled to overturn a verdict? And on this record, that certainly can't be sustained. What the jury heard with regard to that count 2 was that the defendant was the general counsel of a publicly traded company. That in that capacity, he was involved in and aware of all the major decisions that happened in the company. He had daily contact with the CFO. He was required to review all of the press reports, the financial information it was reporting, and the financial guidance it was providing. In addition, he was required to pre-clear all other officers' trading. So he, by virtue, the jury could reasonably find, he virtually always, particularly at these times when he was engaging in these trading, was in a position to be aware of these things. But the evidence went even further. He told at least one person not to trade. Yes, well, there's, and again, and Your Honor makes a very good point, because another failure of the district court, in addition to ignoring circumstantial evidence and certainly not giving the government the reasonable inferences to which we were entitled under this standard, but the other problem is that the district court failed to look at the overall picture. Where we stand right now is that the defendant does not even dispute the jury's finding that he engaged in insider trading. He doesn't challenge that portion of it. But somehow we must accept that the jury was irrational when they found that he was also engaging in insider trading two weeks before and two weeks after. And how do we review the jury? We look for substantial evidence that was beyond a reasonable doubt. No, Your Honor. Your review at this point is whether any rational jury could have found it as this jury did. The whole purpose of Rule 29... Beyond a reasonable doubt. Beyond a reasonable doubt. But it's a very deferential standard for a very good policy reason. This is why we have juries. The jury's heard this. And what you have, what permeates the brief was basically just a regurgitation of the arguments that defendant made at trial in which the jury clearly and correctly rejected. Let me ask you a question if I might, Mr. Cohen. There's a point with respect to the conspiracy count that I'm curious about. The second superseding indictment charges that there was to be, this was a conspiracy to exchange insider information. And the district court makes a lot of that and talks about the bi-directional nature of the charged conspiracy. And that in the end, the most you proved was insider information flowing one way. So I'm summing up here, and I don't mean to do a disservice to the district court, but I took it that the district court's point was you chose to charge a two-way flow of information. You could have charged a conspiracy in a different way, but you didn't. You chose to charge a scheme that had information flowing both ways, and you didn't prove that conspiracy. What's wrong with the district court's analysis in that regard? Well, I think the district court in that instance erred both legally and factually. I'll address the factual. If there's one area that we're certain that the jury looked at the exact issue, it's this area. The jury asked one question while it was out. And this was a jury, by the way, that needed only two and a half hours to deliberate on this case. It was not a close case. The jury asked one question. Well, the trial court used that short period of time to call into question the thoroughness of the jury, didn't it? Well, I think that's not an unfair reading of what the district court said. But he didn't actually articulate it, but I don't disagree with that. But the jury, in its time of its deliberation, asked one question. And its question was, do we need to find an actual exchange? And the government argued to the district court, well, no, judge, you just need to instruct them that there was an agreement and at least one overt act in furtherance of it, which we believe was the correct law then and is the correct law now. Over our objection, the district court said, jury, yes, you do need to find an actual bidirectional exchange. And they went back and then they promptly returned the verdict. If there's one clear place in here where the district court improperly usurped the jury, it's there. But now, and I'll talk just briefly about what the evidence was. Critical, and I think this is a critical point. Well, why would that be usurping the jury? That would be, from your perspective, an incorrect explanation of the law. It wouldn't be a jury usurpation, would it? I'm sorry, I didn't hear the last part. Why would that be a jury usurpation? I thought you were arguing that's an incorrect explanation of the law. Well, but having given the jury an incorrect explanation of the law, which was more favorable to the defendant than the law provided. They still convicted him. They still convicted him. They asked the question, judge, do we need to find an exchange? And the judge said, yes, you do, even though that was an incorrect statement of the law, and they still found it. So now, certainly, knowing that we have the proper standard, which was, did we have to prove an agreement to exchange? So, in other words, with regard to the conspiracy, all we needed to prove was they agreed to exchange, and there was some overt act. So even if there had been, as the judge said, a one-way exchange, that would have been sufficient for conspiracy. Well, I thought on the conspiracy count, the district court was troubled by whether or not Sands was actually an insider and came up with a different definition of insider than you were putting forward. Well, I think it's fair to say the district court had a variety of concerns. That was one of them. And it played into the other, right? The arc of the argument was he couldn't have exchanged insider information because he wasn't an insider. Well, he even went farther than that. The district court, in a situation where we were entitled to all the reasonable inferences, made a finding that the defendant would have known, by virtue of the fact that he had some expertise in securities law, that while he was exchanging information, he could not possibly have been violating the law because he would have had such an understanding that Sands couldn't be an insider, both as how it was applied, but it's also wrong as a matter of law because the district court was just plainly wrong in its finding that Mr. Sands could not be an insider. The theory is that no lawyer can commit a crime, an element of which is the intent to break the law. That's what the court is saying. Well, you guys are lawyers. He knows the law. Well, right. I guess that's right. I hadn't thought about it that way, but I think Your Honor makes a good point. You've pretty much opened the floodgates for lawyers to say, well, I knew the law, so therefore, I never would have had the intent. You've broken it. I knew the law. And here, obviously, what's the reasonable inference? You have a lawyer who is showing time and time again that he wants to violate the law. Let me ask you, but I think it's in one of your footnotes. You mentioned he was an incredibly fluorescent investor and that he only missed once. The only time he was on the downside of the market. I think you said it was November of 2003. It was a $900 sale. Was that right? And that was brought to the jury? No, Your Honor. After he was questioned by the SEC? What happened was he gets the first call, June 21st, 2004. Four. The SEC calls Mr. Heron in his capacity as the general counsel of the company. I'm sorry, what month was it? This was June of 2004. Okay. They call him June 21st. They ask him in that phone call, have you been trading in Amcor? He tells them no. He had traded that day. The clear inference the government would respectfully submit is that he made one small, innocuous trade the wrong way two days after, having given some thought to the fact that perhaps regulators were on to him. And that was for $900? That was for $900 out of a total of 650,000 trades, every single one of them, which worked to a $650,000 worth of trades over the course from October 2003 to July 2004. Is there anything further up? Thank you very much, Your Honor. Thank you. Good morning, Your Honors. My name is Joseph Veronica. I'm with Duane Morris. Along with me at counsel table is Robert Dietrich. I can assume he did all the work. Because the person over there, the younger guy at the podium, that's always the guy who did all the work. Sometimes it doesn't work that way. Okay. All right. And we're here on behalf of Mr. Heron, and together we represented Mr. Heron below. Well, maybe you can help me with a question that I mistakenly asked Mr. Cohen about 20 minutes ago. What would be your response to the part of the brief that I read? Well, I think there's much hyperbole in the government's brief. What I'd like to do is address. But I thought, frankly, the part I read to you was pretty boring. But, Your Honor, the fact that Mr. Heron might have been trading in Amcor stock and made money on his trades is really not the question or the answer in this criminal case. No, I agree with you. It's part of the evidence. It's part of the timing of it, the amount of it. And I'll tell you, the $900 down, that's why I asked about it. Well, if I had to argue to the straight for the government, that would be something that would just, I would do a dance on that one. The only time he missed was for $900 compared to the quantity of trades he'd been making when he was right. And it coincidentally happened right after he was contacted by the SEC. That's when he misses. And the bet he misses on is a $900 bet. The bets he's winning on are $33,000, $66,000. And he's got a gross income of $140,000. I mean, I would have been dancing all over the courtroom on that. But the money that he might earn is different than his portfolio. Try to think. We're losing you on the tape. But much of the money that Mr. Heron had in his portfolio was the result of his compensation from Amcor. Well, but that's not the evidence that the government says it put on, and it was before the jury. The evidence before the jury, which evidently was admitted, and we're not here talking about erroneous evidentiary rulings. The evidence before the jury, as summed up by your opponent, was here's a guy who made over half a million dollars straight in that stock with an unbelievable batting average. And that's evidence which rational jurors could look at, and from which rational jurors, along with other things, could say, you know what? The stars just don't line up to the tune of close to $700,000 for people trade after trade after trade after trade. Particularly when they're the general counsel, chief compliance officer of the company for which they are trading. And telling other people on at least two occasions, you can't trade now. So why is it irrational for a jury to look at that and say, you know what? Sounds like material inside stuff to me. Because just because, and in Burlington Code, just because you might be an insider and trade securities and make money doesn't in and of itself mean that you violated the law. But after he sold at a profit, the stock dropped, and the stock moved after his purchases. He was always on the right side. But the government has the burden to prove that Mr. Heron was in fact material non-public information. That Mr. Heron possessed that material non-public information, and that he traded based on that information. And you concede they can prove that circumstantially? Yes, they can. However, there must be some evidence in the record from which the jury can infer and draw an inference, a reasonable inference, that's deducible from the evidence that's introduced. The mere fact that Mr. Heron was the general counsel of the company means nothing. I agree with that. Okay, because the government constantly throughout this trial, and that's part of their argument, in the loop. Well, he wasn't in the loop. He wasn't in the loop. Did he see press conference before they were made public? First of all, he was not involved in any of the business decisions. He didn't negotiate any of the deals. They wouldn't have to negotiate. All he has to know about, he's got to know about the deal. There was testimony at the trial on a number of issues dealing with materiality and so on and so forth. Financials, deals, when deals become material, when finances become material. Mr. Heron reviewed draft financial press releases. Those press releases, he didn't draft them. They came into being towards the end of the month after the quarter ended, around the 22nd, 23rd time frame. Sure, but if he sees them before the rest of the public sees them and he trades stock, isn't that the very definition of trading on material, non-public information? Assume the materiality element for a minute. It's non-public, hasn't gone out. He sees it. He trades. He's trading on non-public information, isn't he, by definition? I don't necessarily disagree with you. However, that's exactly what Judge Dalzell did when he found on count three that Mr. Heron reviewed, on the 22nd of March, a draft of a financial press release. Judge Dalzell said he believed that a reasonable jury could conclude that Mr. Heron, at that point on count three, possessed material, non-public information, and the trades he made from the 23rd to the 27th were securities fraud. Mr. Heron did not appeal that and is almost finished serving his time pursuant to the sentence in jail. We'll want to get to sentencing, or at least I will here in a minute. But instead of talking about the case, which you're right, the piece of the case that isn't on appeal, let's focus back on the piece that is on appeal and answer the question, as to those counts for which a judgment of acquittal was rendered, why isn't the information which has been cited here by Judge McKee, quoted in open court and in the brief, what is it that makes a jury looking at that irrational for saying, golly, you know what, that is beyond coincidental, that this person, with the access to the non-public information, and making $600,000 to $700,000 in trades, was trading and the market was moving in accordance with the trades that the guy had made. If we are willing to say that whenever somebody who might be a corporate official, trades securities, trades that company's securities and makes money, that ipso facto, that person is in violation of insider trading, that's quite something to chew on. To add to that thing that if we are saying, the fact that the person has access to, let me give you a scenario, assume somebody who works in a company, they're not the attorney, they're the printer, and in the course of working as a lowly printer, the person is printing up these press releases, and the jury here has evidence that over a course of time, this person has these press releases that sometimes have information that would lead the public to believe that the company's stock is going to go up, sometimes in those things the guy is printing up, is information that would lead the guy to believe that the stock is going to go down, and the guy starts trading in the company's stock, lo and behold, this guy would make Warren Buffett look like a piker, because every time he trades, except for one time, he just happens to bet it right. He happens to make very substantial trades right before the market goes up, that bring him money. He happens to make substantial trades right before the market goes down, that bring him money. Each time the trade that he makes is consistent with information that's in the documents that he is printing up, except for one time. He gets a call from a local guy and says, we're kind of suspicious that maybe you're leaking something in these press releases. Is that possible? And right after that, he makes a penny-ante, $2 purchase of stock, so he can demonstrate that he's losing. Could somebody conclude from that, my gosh, this guy must be taking the stuff that he's printing and relying upon that information and going into the stock market with it. Why couldn't somebody make that conclusion? They can't. They can't for the simple reason that the law requires that in order to be found guilty of insider trading, you must satisfy those elements. The mere fact— Okay, go through the elements for me. What are the elements? There must be material non-public information. Okay, and I gave you that in my scenario. The guy's printing the stuff. There must be that the defendant had possession of material non-public information. Okay, I gave you that. You can't just say because he was in that office that he automatically had material non-public information. No, it's in the hypothetical. It's in the hypothetical. In my hypothetical, the guy had access to it. The jury could find that he read the stuff that he was printing. If by your term, access, you mean possession and knowledge of it, and then he trades based on that, then the elements will have been met. But you're assuming something. You are assuming that the mere fact that he was the general counsel— No, my guy's not. He's the printer. He's not. Maybe he's the general counsel and printer. This company really is going back. Well, if he sees all this stuff, and there are cases on that, you don't have to be a corporate official to be that, okay? And that's what Judge Alzel said. Judge Alzel said when we were talking to Sands. And the other thing, there was no dispute that Mr. Herron was an insider. So let's put that aside. But get back to my little printer down there. Could the jury find that this guy is doing insider trading? Yes, because he would have had access. You would have established that there was material, non-public information, that he had access, and that he based his trades on that. And what if the jury is concluding that he based his trades on the access? What if my scenario, let's the jury conclude, this guy's basing his trades on the access. You just said that you could do that. There may be, the jury might be able to conclude that someone, like the printer, who prints the final press release or draft press release that goes out and shows that the income of the company is going to tank, and therefore the stock is going to tank. He suddenly, after never having traded in this security, or let's assume the other side, is going to go up. He goes out and he mortgages his house and buys stock. Clearly, I don't think anyone would dispute that. Still an inference about on the basis of. The same kind of inference has occurred here. Why isn't that the case? Why isn't your guy the printer? Does it have to be a written record saying that I'm going to buy this on the basis of? No, because that you can determine by circumstantial evidence. But in your hypothetical, what you've said is the printer, there was material nonpublic information. The printer had it, possessed it. And at the time he traded, he had it. And those trades were based on that material nonpublic information. And you're answering that third question by inference. That's right. Which you're permitted to do, right? Correct. However, that's not this record. And that's what we need to, we can't lose sight of. What's different? What is totally different is that in each count, there are specific allegations that the government made, either in the indictment or in the Bill of Particulars, on what it is that they claim the information was Herron had. Count two. They claim Herron had information that the quarters revenue were going to be great. And he went out and bought shares on the 15th to the 17th. What did the evidence show? The evidence didn't show anything. What the evidence showed was the first time Mr. Herron became aware of the financials for that quarter was when the press release was issued on October 27th. Now, wait, wait, wait, wait, wait. When you say that that's what the evidence showed, was there no testimony, Mr. Ryan, nothing in the record that would permit a jury to say, no, we don't believe that's the first time he had that information? Let me tell you what the testimony was. The testimony was that on October 2nd of 2003, there was an audit committee meeting, and Mr. Herron attended that audit committee meeting. At the time, the issue in front of Amcor was whether it would have to restate prior earnings that it had submitted based on a difference in the financials from a Korean subsidiary, Anon, and whether that was GAAP. Financials were discussed. The evidence revealed from Mr. Joyce and Zuck that the financials that were being discussed were the old financials that would have been the subject of the possible restatement. On the 15th, then the government tries, on October 15th, you have Joyce saying, well, around the 15th of the month after the quarter, there would be unaudited financials around that time that would go to the auditors. There was no testimony by Joyce or anyone else that Mr. Herron regularly saw unaudited financials before the press release was issued. No testimony. Judge Galzel, in his analysis on count two, went exactly through that and said, there's no evidence that Herron possessed. I think I got you. Let me ask a question on another point, if I might, with Judge McKee's permission. Can I just grab the floor?  I'd like you to respond to a couple of things. First, as to the conditional grant for a new trial, two issues that I'm interested in your take on. One, I've seen your response in the briefing to the Rule 33 argument, so I'll set that aside. But what's your response to the government's argument that there was no objection at trial, nor any comment by the district court, or any opportunity for the government to be heard, that something had been said amiss in closing argument, and that indeed the judge had said, nice job, everybody, as he sent them out of the courtroom. So to have a finding of plain error on the basis of government misconduct dropped on them after the fact is simply untenable on the record. Your response? My response is they certainly had the opportunity to respond when we filed our, albeit untimely, motion for a new trial. The basis for that was set out. Instead of responding to it, which I certainly would have expected the government would do, instead they filed a motion to strike, which the court granted. So they had the opportunity to respond. They chose not to. And the government and then the judge. Got your answer to the they didn't get to respond. How about no objection at trial, no comment by the district judge, and the only comment by the district judge at all that might be seen contemporaneous is the nice job, guys, comment. How do you square that up then? I think the judge was being a gentleman to all the parties. It was obviously a contentious trial. And so I don't think that he was going to say anything at that point, see what the jury does. But it's plainly misconduct. It was over the top. I was a prosecutor for 15 years. And I was amazed at what went on in that argument, especially in that one minute or so of rebuttal. No objection. You're correct. No objection. And the judge in his, and what I'd ask the court to do is, and I'm sure you've done this, but this opinion is a 54-page opinion that details the evidence that was presented. There's no doubt on count one, you've got two friends who are merely cheering each other's companies. You've got Heron talking about positive information. And guess what? At no time does Sands trade. At no time is he purchasing stock. But Heron starts buying Neoware. So then we go through and Mr. Schenck, the CFO, the two things that the government claimed were material non-public information was the information that there was a CVS deal and that Q4 could be big, say no more. But talk about those. That information about Q4 could be really big was the first of April. That's the first day of the quarter. There would be no financial information. And to boot, it's April Fool's Day. CVS, Schenck, there was no CVS deal. It was an IBM deal. There was never a definitive agreement with CVS. There was an agreement with IBM. When that was concluded, there was never a press release. There was never an 8K. So that information that the government claims is material non-public information is nonsense. The Q4 could be big. Well, that would mean, too, well, it could be bad. So and then on the other side, whatever Heron's doing, he's telling them great stuff about Amcor. But Sanchez isn't going out there buying Amcor stock. Is your legal position that the other side has to act on the tip in order for the tip to be an improper thing to do? That if insider information is shared, it's not actionable if the other side doesn't go ahead and start buying? In the posture of this case, let me answer that two ways. Number one, it's charged as a conspiracy. One way to look at it, but there's an agreement. You've got to establish an agreement. Clearly, there was no direct testimony. SANS could have testified. The government chose not to call them. But at least what you've got to do is look to see from the underlying evidence that was produced, can you back in and say that conduct that we're talking about, the jibber-jabber of these two guys, shows an agreement to exchange material non-public information and to base trades on that. And the district court says two things. No, there wasn't. And number two, by the way, government, you charged with specificity in your paragraph nine that they exchanged information, including material non-public information, upon which they made trades in NIOWARE and ANCOR. They didn't. Count two. We've already gone through count two. And on count four, the government, again, talks about two events. Two events, the UNITIV deal, which was an acquisition, and on June 10 at 3.23 p.m., an email that went from the CFO to several people, several officers, including Mr. Herrick. And two things were in that. Number one, they talked about the financial on the UNITIV deal, and also the CFO was suggesting that we might have to make a pre-announcement because our quarter, the way it looks, we might not make the guidance we issued at the beginning. He did that without the CEO and COO's knowledge. They disagreed. Four days later, CFO agrees that that was untimely, and they're going to wait until the quarter develops. Guess what? No trades that Mr. Herrin makes between June 10 at 3.23, Mountain Standard Time, after the market closes, and he doesn't trade again until the 15th. So there's no trades during that period where somebody might argue that that was material information. And Judge Dalzell, in his memorandum opinion, and in the instructions, and we have it laid out in our brief, materiality is basically, and the definition is there, but materiality is a fluid concept. It could be material at one point, become immaterial. We understand the concept of the shelf life there. I have one last question, if my colleagues will permit me, and it goes to the sentencing issue. In this detailed opinion from the district court, there's footnote 17, where the court says that it's clear that Herrin took advantage of his position and sought to profit while preventing other insiders from trading, unquote. And, of course, his position included compliance officer with respect to insider trading. Explain to me how, then, the district court's decision with respect to the sentencing enhancement can be viewed as a logical application of the guidelines. You're talking about the abusive position of trust? Exactly. The government waived it. The government, under Rule 32F, that enhancement was not in the pre-sentence report. There was a more substantial enhancement under 2B.1.1, which the government said, that's the enhancement. They did not file objections to that report under 32F that that enhancement of abusive position of trust, even in its memorandum, it lays out, because that would have given them a four-level increase. The judge heard argument on that. The judge then denies that request, says it's inapplicable. The government could have, at some point, had they missed the 14-day under 32F, under 32I, they could have filed a request for good cause that they were tardy in filing an objection to the fact that that bump up under 3B.1.1 wasn't made. They didn't do that. It was after the judge denied it under the four-level, which they were hoping to get, then he just mentions it, and the judge denied it. So that's the answer there. They waived it, and those rules are clear. The government deals with these sentencing issues every day. And to basically conclude, we believe that Judge Dalzell was correct in each of his rulings in setting aside the verdicts on counts two and four, that he was correct in the way he determined what relevant conduct should be considered in that sentence. And the only relevant conduct were the trades from March 23rd through March 27th. And that's the period that he said the reasonable juror could conclude that he, on the 22nd of March, received that draft financial press release. And trades thereafter, until it was publicly released, were based on material non-public information. Those are the only trades. This is not, like the government likes to say, what he traded during this entire period. So that's relevant conduct. Wrong. This is not a drug case where someone is convicted of 10 grams of Coke, but he had in the bag 100 grams. Clearly, possession of Coke is intrinsically wrong and in violation of the law. Trading in stock is not. Is not. It's specific insider trading. Went through the elements. That's what you've got to have in order for those trades to be considered relevant conduct. And there wasn't any other than those trades between those three days. The mere fact that Mr. Heron made money in trades or prevented the loss of more money is not relevant until the government can establish that those trades were insider trading based on material non-public information. Otherwise, what you're saying is that any corporate executive who trades at any time who might be in a position to come in possession of material non-public information violates the law and is doing insider trading when he or she trades in that stock. And I can't believe that this court or any court would conclude that. Thank you, Mr. Heron. Mr. Corwin, I think you've reserved a few minutes. Thank you, Your Honor. If I could just address an issue that Judge Jordan began with and is somewhat near and dear to my heart, which is this finding of misconduct. To be clear, there was no objection, as the court pointed out, and there was no ability to respond because the issue that became the promoted misconduct here was apparently misstating the law by arguing that for materiality purposes, investors would want to know certain information. Specifically, the district court said that that somehow required the jury to lack the element that the investors would use it for investing. The government respectfully disagrees that in the context of this case, that makes sense, but urges the court, in light of the serious finding of misconduct against an assistant U.S. attorney, that that portion of the district court's opinion not be left unreviewed by this court. If I could also just talk about a few other. Answer the waiver issue, too. They say you're in no position to complain about the sentence enhancement. You waived it. We didn't waive it, Your Honor, and here's why. The application that we advocated and which the pre-sentence report adopted specifically precludes the application of the additional one. In other words, there's a four-level enhancement for finding that an officer and a director of the company. We advocated that. We're not pursuing it on appeal, although we respectfully disagree with that decision. We decided to rely then on the very obvious application of the abusive position of trust. There was no argue of waiver at that time. It was argued on the merit in front of the district court. There's no prejudice to the defendant. They argued it. They anticipated it, and we simply didn't waive it under those circumstances. We couldn't have argued both because the application of the 2B1.4 prohibited it. So having seen it in the pre-sentence report, we couldn't object. They had adopted our view. So we didn't waive it, and there's no prejudice would be my response, Your Honor. Judge Lurie had asked with regard to what are required to prove this sort of somebody traded on the basis of the information, and Judge Lurie asked, well, do we have to see him actually put it in writing that that's what I'm doing? And the courts all resoundingly say, no, that's not what's required. That's a rhetorical question. Well, but in fact, this defendant was kind enough to put it in writing for us. With regard to, I would point to the appendix at page 1149, which is an e-mail that he sent to Mr. Sands saying, I've made acquisitions in Neoware. I'm waiting for the news. This is a critical e-mail with regard to the conspiracy count and his overall guilty intent, in that the district court recognized the significance of this e-mail but read it incorrectly. The district court thought it was an e-mail from Sands saying, I've made acquisitions in Neoware. In fact, it's undisputed and the record clearly reflects that it was Heron who sent the e-mail. I submit that had the district court read that correctly, the whole opinion would look different, because even the district court recognized the significance of that. To address the sort of overall policy argument that the appellee advocates here and that the district court expressed some concern about, which is if we take a look at this idea that somehow we're not allowed to consider somebody's position within a company, it's going to result in some blanket prohibition against executives trading in the company. That's not what the government is advocating. That's not really what he's arguing. He's basically telling us to analyze this with a scalpel and not jump to unwarranted conclusions based upon circumstances that might not support that conclusion. That's what I think he was arguing. But I think he goes farther than that, Your Honor, because what he says is not only don't jump to conclusions, don't give them the inference. Just as Your Honor points to the lowly printer, and in a case like that, you'd prove it circumstantially. You'd prove, well, at about the time that the printing comes in, he has access to it. These are very large trades in the amount. They work to his advantage. He immediately sells afterwards. Those would be all the things that would go into the mix. But you wouldn't assert, would you, Mr. Cohen, that the position alone would give you an inference? Of course not. No, Your Honor. That's what he was arguing. Right. No, not the position alone, but it's highly, highly probative. Let me push here for a second because if I understood Mr. Ronick's argument, I understood him to be saying, and the district court to be saying, that it's not enough for the government to have said, this guy was in some board meetings and took some minutes and things like that. The government had to have shown that with some greater specificity that there was actually some non-public information in that relevant period on which he could have acted. And that they did that with respect to Count 3, but that they just fell down on the job on Count 2 and 4. That there really isn't anything in the record akin to what's in the record with respect to Count 3 as to Counts 2 and 4. Why don't you, if it's all right with Judge McKee, it's okay, why don't you answer that argument, which is, here's Count 3, use it as a counter distinction for what the government had for Count 2 and 4, and you'll see they didn't have the same kind of non-public information that they can point to. All they can point to is, he's a guy who knows a lot of stuff, and that's not enough. Sure, Your Honor. What the district court did was cherry pick the most... Well, go ahead now and cherry pick the stuff you really like. Sure. I'll tell you with regard to Count 2. Here we have Count 2. What occurs? They close the quarter ending September. So now you're into October. The evidence shows that the company is constantly doing internal forecasts, that each month they're doing month ends, that they generally know the trend of what is common sense of the reasonable inferences, that the people who are in the know at a company are generally going to know. But it goes farther. That's the point, I think, that they're arguing with, the people who are generally in the know. You know, what they're saying is you can't do that. You can't say... In and of itself, I agree. In and of itself, and if that's all we had, then I would agree with you. But what we have, that is, what does this defendant do? The evidence was that typically by the 15th of the month, they would have their numbers pretty well firmed up. And not only did they get that both from the testimony, but the jurors also saw that with regard to the other counts. And again, you have to look at the... This court has said in Brody, you can't just fragment. You have to look at all the evidence and see. So what does the evidence show? Well, all of the stuff with regard to the financial information that he gets with regard to preannouncements in the subsequent quarters, that's coming in the 13th of the month, the 14th of the month. They see that subsequently happening. The trades themselves. I submit, Your Honors, that a jury could reasonably find, based on the volume of the trades and the timing of the trades and his position in the company with regard to count two, which I concede is the circumstantial count. The other counts, we get into, frankly, overwhelming evidence that he has the financial projections. He has. And the jurors could consider, well, what sort of information does he get? Not just, oh, he's generally there. Well, what does this individual specifically get, and when does he get it, and what does he do with it? He makes between $130,000 and $140,000 a year. Over the course of three days, what he already owns, 90% of his investments are in this stock. Undisputed. He takes his entire annual take-home pay over three days, buys it. At the same time, he sends an email to his neighbor saying, go log in the stock. The SEC review has been completed. In other words, we dodged whatever could have gone wrong here with this quarter. We've now dodged. We're not going to have to restate anything. Two weeks later, they announce a landmark quarter, and what does he do? Immediately sells and takes the profit. Then what happens? No trading. But it's not the selling that's the problem. It's the buying. Well, for sure, because by then, we're arguing, you know, the selling would also have been part of insider trading because you're reaping the reward. But he sold it after the public information came. But then it's very instructive, the overall pattern. What happens? No trades in the stock. He maintains his 90% level, his investments all in Amcor. The next time you see trading is April 1, 2004, and what happens then? They've closed a quarter that is abysmal. They've missed their guidance. There's discussions by the middle of April that they're going to have to preannounce, which the jurors heard evidence that that's a major corporate event. And they heard evidence that your opponent's client was aware of this information. Not only did they hear he was aware of it, they saw e-mails where he obtained it, commented on it. It went back and forth, was involved in it. I mean, this was the general counsel of the company. The defense argues here, as it did at trial, that there's some, well, he wasn't involved in decisions. He performed what a general counsel performs. And if a publicly traded company is going to have such a bad quarter, then it has to preannounce to the investing public that we can't even wait until our quarter end to give you this because we're missing our guidance so badly. He knows this. He knows this in the middle of the month. It's not in dispute. He was aware of it. It's not in dispute. He traded on it. Well, when you say it's not in dispute, I thought I just heard Mr. Ronick a few minutes ago say that as he laid out or was talking about this, that there was a pretty substantial dispute about what Mr. Herrin knew and didn't know surrounding this potential preemptive statement to the market. Well, if we talk about that, and that's in count three, in April of 2004. But wasn't there also a dispute as to whether the offices felt there had to be a preannouncement? Now we're talking about count four. Well, there was discussion in both months. But what's not in dispute is the fact that he had the information. What's in dispute is the inference to draw from it. In other words, the defense argued at trial and successfully that it's not material to know that the CFO has instructed the board that we have, with regard to count four, that we have our actual results for April and May. We've missed badly. The prospects don't look good going forward. They don't dispute that he received that information. They dispute that a jury was irrational to think that it was material. I respectfully submit that that just is contrary to all law and common sense. If there's anything that jurors or that investors would consider material, it would be the internal projections of a company. In fact, the Ninth Circuit case that we cite in our brief, Smith, is exactly that. The Ninth Circuit says that, above all other things, is what investors are interested in. And the question was not whether or not reasonable minds could disagree over the materiality of it. The question was, was this jurors who heard the evidence, was it irrational for them to have found it? And that simply can't be sustained under the Rule 29. Certainly, there's no case law out there that says that jurors cannot find materiality in financial projections, guidance, even the mere fact that the CFO is saying we're going to miss it. We understand that your argument would be a jury question. Thank you very much. I think your case was exceptionally well argued. I'll say I'm going to probably see you again, Mr. Veronica. I haven't seen you before. Hopefully, I'll see you again. You're a really fine advocate. We look forward to having you back in here. Thank you. Thank you.